UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| Case No. | 5:26-cv-00208-SSS-DTBx | Date | January 19, 2026 |
|---|---|---|---|
| Title | *Carla Maria Vargas Lisboa et al v. Kristi Noem et al.* | | |

| Present: The Honorable | SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE |
|---|---|

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **(IN CHAMBERS) ORDER GRANTING IN PART RENEWED APPLICATION FOR EX PARTE EMERGENCY TEMPORARY RESTRAINING ORDER [DKT. NO. 8]**

Before the Court is Plaintiff Carla Maria Vargas Lisboa's Application for Ex Parte Emergency Temporary Restraining Order and Order to Show Cause re Preliminary Injunction.  [Dkt. No. 8, Renewed Application or "Renewed App."]. Having considered the arguments, relevant legal authority, and record in this case, the Court **GRANTS** in part the Renewed Application.

## I.     BACKGROUND

On December 16, 2025, Plaintiff Carla Maria Vargas Lisboa filed a Complaint alleging claims for declaratory and injunctive relief seeking review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, and for violation of her Fifth Amendment right to due process, against Defendants Kristi Noem (Secretary of the U.S. Department of Homeland Security), Joseph B. Edlow (Director of the U.S. Citizenship and Immigration Services), and Connie Nolan (Associate Director of USCIS Service Center Operations Directorate).  [*See* Dkt. No. 1, Complaint or "Compl."].  Plaintiff's principal

concern in her Complaint is that she fears that ICE will unlawfully arrest her when she appears for her I-485 adjustment of status interview scheduled for Tuesday, January 20, 2026 at 10:45AM. [Compl. ¶ 46].

Plaintiff concurrently filed an Emergency Ex Parte Application for Temporary Restraining Order as to Arrest at I-485 Interview, seeking an order enjoining Defendants from arresting her at the interview. [Dkt. No. 3]. The Court denied this initial application due to mootness because Plaintiff had stated that her interview was on January 16, 2026, which had already taken place by the time the application was filed. Plaintiff then filed on January 18, 2026, a corrected Ex Parte Application for a Temporary Restraining Order, clarifying that her interview is scheduled for January 20, 2026. [Dkt. No. 8].

## II.    JURISDICTION

### A.    Standing and Ripeness

In deciding this matter, the Court must first consider whether Plaintiff's claim is ripe for review. The doctrine of ripeness permits courts to "dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur." *Chandler v. State Farm Mt. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). For a plaintiff to have Article III standing "[t]o seek injunctive relief, a plaintiff must show that [s]he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Because the ripeness inquiry focuses on whether an injury "is real and concrete rather than speculative and hypothetical," it "merges almost completely with standing." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).

Here, Plaintiff's claim is ripe for the same reason she has demonstrated an injury in fact sufficient to establish Article III standing. Plaintiff's Complaint references several recent news articles from reputable channels, affidavits from multiple immigration law practitioners, and case law indicating that ICE is indeed detaining I-485 applicants who, like Plaintiff, were admitted and lost status due to overstay of their visa but applied for adjustment as immediate relatives of United States citizens. [*See* Dkt. No. 1, Complaint or "Compl." ¶¶ 59–63, 94; Dkt. No. 8-

1 Exs. 2, 3].[1]  Taken together, this evidence establishes an actual and concrete risk of imminent detention that goes beyond mere conjecture.  The risk is fairly traceable to Defendants' practice of conducting these arrests, and a favorable judicial decision enjoining Defendants from detaining Plaintiff at her interview will prevent the injury.

As such, Plaintiff has shown a sufficient injury in fact to confer standing, and the case is ripe for review.

### B. Final Agency Action under APA

The Court now discusses whether there is a final agency action that is reviewable by the Court.

As a general matter, the APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

---

[1] "A [temporary restraining order] may only be awarded 'upon a clear showing' of evidence that supports each relevant [TRO] factor." *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1030 (E.D. Cal. 2022), *aff'd*, No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) (quoting *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 22 (2008)).  "This 'clear showing' requires factual support beyond the allegations of the complaint, *but the evidence need not strictly comply with the Federal Rules of Evidence*." *CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW-JCx, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)) (emphasis added).  "A verified complaint or supporting affidavits may afford the basis for a preliminary injunction . . . ." *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) (citing *Ross-Whitney Corp. v. Smith, Kline & French Labs.*, 207 F.2d 190, 198 (9th Cir. 1953)).

In light of the relaxed evidentiary standard for TRO proceedings, the Court need not rule on admissibility.  However, for purposes of the TRO, the Court has considered the likely admissibility of the evidence in determining whether the Plaintiff has demonstrated a likelihood of success on the merits.  Where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court has overruled the objection.

5 U.S.C. § 702. This judicial review provision "is not so all-encompassing as to authorize . . . judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800–01 (9th Cir. 2013). The APA confines what is subject to judicial review by limiting review to an "agency action," which is in turn defined to only "include the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2) (incorporating Section 551's definition of "agency action").

An agency action must be a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

What constitutes a final agency action should be interpreted "pragmatic[ally]," *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018), as agency action may be final despite expression in a more "informal" form, *see Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000). *See, e.g.*, *CropLife Am. v. Env't Prot. Agency*, 329 F.3d 876, 881 (D.C. Cir. 2003) (finding that an agency's press release with "clear and unequivocal language" that the agency "will not consider or rely on any [third-party] human studies in its regulatory decision making" to "create a 'binding norm'").

A policy need not be written, or even made known to the public, to be judicially reviewable as a final agency action. *See R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable. A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" (citation modified)); *id.* at 174–176 (determining that plaintiffs had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to consider deterrence of mass migration as a factor in their custody determinations" as underlying the plaintiffs' detention); *see also Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *1, *10 (W.D. Wash. June 21, 2017) (denying a motion to dismiss an APA challenge to "an allegedly secret and unlawful government program" that implemented "an internal vetting policy that has not

been authorized by Congress, nor codified, subjected to public notice and comment, or voluntarily made public in any way").

Although the finality requirement is "flexible" and must be applied in a "pragmatic way," it is nevertheless a requirement that a plaintiff seeking review of agency action must satisfy. *See Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

Here, the Court finds that the evidence is sufficient, for the purposes of a TRO, to show that there is a final agency action that is judicially reviewable. As discussed, Plaintiff's Complaint references several recent news articles from reputable channels, affidavits from multiple immigration law practitioners, and case law indicating that ICE is indeed detaining I-485 applicants who, like Plaintiff, were admitted and lost status due to overstay of their visa but applied for adjustment as immediate relatives of United States citizens. [*See* "Compl." ¶¶ 59–63, 94; Dkt. No. 8-1 Exs. 2, 3]. Even if no written internal memoranda or regulation were promulgated, the agency's recorded conduct here is akin to informal, unwritten policies that other courts have found to be judicially reviewable under the APA. *See R.I.L.-R*, 80 F. Supp. 3d at 184; *Wagafe*, 2017 WL 2671254, at *10.

Additionally, on at least two instances, an ICE spokesperson sent the following statement in response to inquiries about such enforcement efforts: "ICE is committed to enforcing federal immigration laws through targeted operations that prioritize national security, public safety, and border security. *Individuals unlawfully present in the United States, including those out of status at federal sites such as USCIS offices, may face arrest, detention, and removal in accordance with U.S. immigration law.*" [Dkt. No. 8-1 Ex. 3 at 40, 82 (emphasis added)]. This is further evidence that the agency has done nothing to dissociate itself from its agents' behavior and has instead ratified such arrests at USCIS offices. *See Washington v. U.S. Dept. of Homeland Security*, 614 F. Supp. 3d. 863, 872 (W.D. Wash. 2020) ("[B]ecause [U.S. Customs and Border Protection] has done nothing to disassociate itself from its agents' behavior, it must be viewed as at least ratifying the "courthouse arrests" at issue and the furtive manner in which they have been performed."). This conclusive ratification signals a "consummation of the agency's decisionmaking process" and is not "merely tentative or interlocutory nature," satisfying the first prong of the *Bennett* requirement for final agency action.

The second *Bennett* requirement, that the action must be one from which legal consequences will flow, is also satisfied. Because of ICE's enforcement efforts that depart from its previous practice, Plaintiff is at imminent risk of being detained, placing her adjustment of status application in legal jeopardy. "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). The record sufficiently shows that ICE's policy here is final and will directly affect Plaintiff's legal rights. As such, Plaintiff's claim is judicially reviewable as a final agency action.

## III.   LEGAL STANDARD

To justify ex parte relief, the moving party must demonstrate that it would be "irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures," and that the party is "without fault in creating the crisis that requires ex parte relief, or that crisis occurred as a result of excusable neglect." *Mission Power Eng'g Co. v. Con'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995).

For the Court to grant an application for a temporary restraining order, Plaintiff must show: (1) it is "likely to succeed on the merits" of its underlying claims, (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) the requested injunction "is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Additionally, the purpose of a temporary restraining order "is to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

Courts in the Ninth Circuit may consider the *Winter* factors on a sliding scale and grant an injunction where the plaintiff raises "serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff" if "the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (noting that the latter two elements are "the other two elements of the *Winter* test").

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

Plaintiff alleges that Defendants' practice violates the APA because they failed to comply with notice-and-comment requirements and because the practice is arbitrary, capricious, and an abuse of discretion under 5 U.S.C. § 706(2)(A). [Compl ¶ 80]. She also contends that the practice nullifies the statutory right to pursue adjustment of status from within the United States, in violation of Immigration and Nationality Act § 245(a), 8 C.F.R. §§ 245.1(a), 245.2(a)(1)(i). [Compl. ¶ 81]. Plaintiff finally asserts her rights under the Due Process Clause of the Fifth Amendment, alleging that the practice violates her liberty interest in pursuing adjustment of status. [*Id.* ¶ 119–24].

The Court begins with the text. Under the INA, at 8 U.S.C. § 1255, Congress provides pathways to legal residency for certain classes of noncitizens.[2] These pathways permit noncitizens not lawfully in the United States to "adjust" their status to legal permanent resident if they meet certain requirements. As an

---

[2] This Order uses the term "noncitizenship" in place of "alienage" and "noncitizen" in place of "alien." The Court follows the U.S. Supreme Court and Ninth Circuit, where the use of the term "noncitizen" has become a common practice. *See Patel v. Garland*, 596 U.S. 328 (2022) (Barrett, J.); *United States v. Palomar-Santiago*, 593 U.S. 321 (2021) (Sotomayor, J.); *Barton v. Barr*, 590 U.S. 222, 226 n.2, (2020) (Kavanaugh, J.) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3))); *Avilez v. Garland*, 69 F.4th 525 (9th Cir. 2023); *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018). Additionally, this Court thinks it is prudent to "avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing." *Chicago Manual of Style Online* 5.253, https://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec253.html. As noted by the Ninth Circuit, "[t]he word alien can suggest 'strange,' 'different,' 'repugnant,' 'hostile,' and 'opposed[.]'" *Avilez*, 69 F.4th at 527 n.1 (citing *Alien*, *Webster's Third New International Dictionary* 53 (2002)). Accordingly, because the word "noncitizen" is synonymous and does not encompass such negative connotations, the Court finds "noncitizen" is a better word choice. *See Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011).

initial matter, for a noncitizen to apply for adjustment of status, he or she must have been "admitted or paroled into the United States." 8 U.S.C. § 1255(a). If so admitted or paroled, the Secretary "may" adjust the noncitizen's status to that of a permanent resident "if (1) the [noncitizen] makes an application for such adjustment, (2) the [noncitizen] is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." *Id.*

Notably, 8 U.S.C. § 1255a(e)(2) states that the "Attorney General shall provide that in the case of a [noncitizen] who presents a prima facie application for adjustment of status under subsection (a) during the application period, and until a final determination on the application has been made in accordance with this section, the [noncitizen] *may not be deported*, and shall be granted authorization to engage in employment in the United States and be provided an 'employment authorized' endorsement or other appropriate work permit." *See Toelupe v. I.N.S.*, No. 89-70045, 1993 WL 356802, at *4 (9th Cir. Sept. 16, 1993) ("Only those applicants who are prima facie eligible for adjustment of status are protected against deportation during pendency of their applications.").

Several other restrictions apply, however. Noncitizens convicted of certain crimes are generally ineligible to apply for adjustment of status because they are deemed inadmissible, *see* 8 U.S.C. § 1182(a)(2), and, therefore, not "admitted or paroled into the United States" unless the Secretary can and does waive inadmissibility. Additionally, as relevant here, noncitizens who work without authorization or who are in unlawful immigration status cannot apply for adjustment of status, *unless they are immediate relatives, such as spouses, of citizens*. 8 U.S.C. §§ 1255(c), (k) (emphasis added). Nor is a noncitizen who voluntarily departs or is removed eligible to apply for adjustment of status within 10 years of the date of the departure or removal. 8 U.S.C. § 1182(a)(9)(A)(ii)(I).

Here, Plaintiff is not barred by the INA's many restrictions. She entered into the United States on a B-2 visitor visa and was admitted until August 2, 2025. [Compl. ¶ 25]. She remained in the U.S. after her visa has expired, creating an overstay. [*Id.*]. There is also no evidence that she has a criminal record. She is married to a United States citizen through a bona fide marriage [*Id.* ¶¶ 26–27]. She has filed an I-130 Petition for Alien Relative and an I-485 Application to Adjust Status. [*Id.* ¶ 28]. All required filing fees, forms, and supporting documentation were submitted in accordance with USCIS regulations, and her prima facie I-485 application is pending as she remains in the United States. [*Id.*].

Plaintiff is, in short, the exact type of applicant that Congress intended to benefit when it adopted and, over many years, repeatedly amended, the complicated statutory scheme governing the adjustment of status process. Defendants' enforcement policy frustrates that scheme.

As the Second Circuit has explained, the INA's "prevailing purpose" is to "implement[ ] the underlying intention of our immigration laws regarding the preservation of the family unit." *Nwozuzu v. Holder*, 726 F.3d 323, 332 (2d Cir. 2013) (quoting H.R. Rep. No. 82-1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680); *cf. I.N.S. v. Errico*, 385 U.S. 214, 220 (1966) (interpreting several 1957 amendments to the INA that created exceptions for immediate relatives of citizens as "plainly" evidencing an "intent . . . [to] keep[ ] family units together. Congress felt that, in many circumstances, it was more important to unite families and preserve family ties than it was to enforce strictly the quota limitations or even the many restrictive sections that are designed to keep undesirable or harmful [noncitizens] out of the country.").

The INA's adjustment of status scheme is perhaps one of the statute's strongest articulations of Congress's considered public policy in favor of family unity and association. And as such, "[t]he immigration laws about adjustment of status are not a haphazard compilation of provisions; they are a calibrated set of rules that govern an area of national importance." *Succar v. Ashcroft*, 394 F.3d 8, 26 (1st Cir. 2005). "The statutory scheme reflects Congress's careful balancing of the country's security needs against the national interests Congress wished to advance through adjustment of status proceedings." *Id.* at 10. Those "national interests" include the preservation of the family. *Id.* at 22 ("[I]n enacting section 1255(a) in 1960, Congress expressed an intent that eligible noncitizens be able to adjust status without having to leave the United States, to relieve the burden on the United States citizen with whom the [noncitizens] had the requisite family or other relationship."); *see also Matter of Ibrahim*, 18 I. & N. Dec. 55, 57–58 (BIA 1981) ("The Immigration and Nationality Act makes immediate relative status a special and weighty equity.").

The Court rejects arrest and detention practices predicated on manipulating the laws that Congress has passed. *See e.g., You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 464–66 (S.D.N.Y. 2018). An I-485 applicant must appear for the interview to maintain eligibility for adjustment of status, but appearing subjects the applicant to immediate arrest, detention, and initiation of removal proceedings. Congress did not intend its carefully considered adjustment of status process for a

select group of noncitizens to become a mechanism for "gotcha" law enforcement. Nor could it, without raising serious constitutional concerns. These type of bait-and-switch tactics are not only a perversion of the statute, but also likely offensive to "the concept of ordered liberty." *Rochin v. California*, 342 U.S. 165, 169 (1952) (citation modified).

Because courts "must assume that when drafting the INA, Congress did not intend an absurd or manifestly unjust result," *Lockhart v. Napolitano*, 573 F.3d 251, 260 (6th Cir. 2009), the Court concludes that Congress could not have intended for the interplay between adjustment and removal to permit ICE to exploit the former in service of the latter. Accordingly, Plaintiff has demonstrated that her concrete risk of arrest at USCIS's offices and her detention pursuant to that arrest is likely not in accordance with the law, specifically the INA under 8 U.S.C. § 1255.

As for Plaintiff's APA claim: the APA gives a court power to "'hold unlawful and set aside' not only agency action that is 'arbitrary' or 'capricious,' but also agency action that is 'otherwise not in accordance with law' or is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Cousins v. Sec'y of the United States Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir.1989) (quoting 5 U.S.C. § 706(2)(A, C)). "It is central to the real meaning of the rule of law, and not particularly controversial that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 621 (D.C.Cir.1992) (citation modified). When an agency action is contrary to the scope of a statutory delegation of authority or is an arbitrary and capricious exercise of that authority, that action must be invalidated by reviewing courts. Because the Court has already concluded that Defendants' policy was "not in accordance with law," the Court likewise concludes that Plaintiff has demonstrated a likelihood of success on her APA claim.[3]

### B. Irreparable Harm

The Court finds that Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief. Not only would her separation from her U.S.-citizen

---

[3] For purposes of granting this TRO, because the Court finds that Defendants likely violated the INA and the APA, the Court does not extensively discuss Plaintiff's Due Process claim, which the Court finds is also likely meritorious.

spouse and her loss of ability to participate in the adjudication of her pending I-485 application be considered irreparable harm, but her arrest itself would also constitute irreparable harm. *See Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018) ("Deprivation of physical liberty by detention constitutes irreparable harm."). The imminent risk of unlawful arrest, forced family separation, loss of work and stability, and potential deprivation of lawful status all constitute irreparable harm.

For these reasons and those outlined above in sections II.A, II.B, *supra*, the Court concludes that Plaintiff faces a likelihood of imminent and irreparable harm in the absence of an injunction.

### C. Balance of Equities and Public Interest

Finally, the balance of equities and the public interest also favor entering a TRO. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[N]either equity nor the public's interest are furthered by allowing violations of federal law to continue." *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022) (affirming that the balance of hardships weighed in favor of plaintiffs alleging that the government violated the INA).

Here, because Plaintiff has demonstrated a likelihood of success on her claim that Defendants would violate the INA and the APA if they arrested her at his adjustment of status interview, and because she has shown that she is sufficiently likely to suffer serious harm, the balance of equities and public interest both "tip[] sharply" in her favor. *All. for the Wild Rockies*, 632 F.3d at 1135; *see also Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) ("Faced with [] a conflict between [administrative] financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiff's favor.").

### V. CONCLUSION

The Court finds that the *Winter* factors are met. For the foregoing reasons, and to preserve the status quo, the Court **GRANTS** Plaintiff's Renewed Application. [Dkt. No. 8].

The Court hereby **ENJOINS** Defendants United States Citizenship and Immigration Services ("USCIS"), the Department of Homeland Security ("DHS"), and Immigration and Customs Enforcement ("ICE"), including USCIS and ICE

officers acting under their direction, from arresting, detaining, removing, or otherwise taking Plaintiff into custody in connection with her scheduled adjustment of status interview on Tuesday, January 20, 2026.

The Court **DENIES** the Renewed Application insofar as it seeks other orders.

This TRO expires 14 days from its issuance, on Monday February 2, 2026, unless extended or vacated by Court order, or by Court order on stipulation of the parties as described below.

The Court **ORDERS** Defendants to show cause, in writing, why a preliminary injunction should not issue. Defendants' response is due Friday, January 23, 2026. Plaintiff's reply is due by Tuesday, January 27, 2026. The Court **SETS** a hearing on the OSC regarding preliminary injunction for Friday, January 30, 2026 at 2 p.m., via Zoom videoconference.

The parties may extend this briefing and hearing schedule, and the TRO, by stipulation and proposed Order filed by Friday, January 23, 2026.

**IT IS SO ORDERED.**